We now proceed to the final case on today's argument calendar, Lang Van, Inc. v. VNG Corporation. And counsel, whenever you're ready. Good morning, or almost good afternoon, your honors, and may it please the court. My name is Corey Baskin, I represent the plaintiff appellant, Lang Van, Inc. Mr. Baskin, I'm having a little trouble hearing you. I don't know whether you can sit any closer. I don't know if my colleagues are having any trouble hearing you. I can't hear him either. I'll try again. Your honors, can you hear me? Sure. Apologies. I'll speak over. No problem. No problem. Thank you. Again, my name is Corey Baskin. I represent plaintiff and appellant, Lang Van, Inc. I'd like to reserve at least three minutes of my time for rebuttal. We come here today, your honors, on this appeal in the wake of a case that this court, not specifically this panel, but this court decided about a year ago, Wenat, AMA versus Wenat. We understand that Wenat is going to be the filter through which we may view the proceedings today. With that in mind, it is critical to point out that while we have the same issues in Wenat, basically determining whether or not the extent of a foreign internet operator's contact with the United States sufficient to give rise to personal jurisdiction, and we have some of the same amici or amici, we do not have the same facts, your honors. And a holding in favor of Lang Van, in other words, a holding that BNG is subject to specific jurisdiction here, is not inconsistent and would not be inconsistent at all with the holding in Wenat. Counsel, in Wenat, we said the fact that the relevant party would attract a substantial number of viewers in the United States. This alone did not support a finding of express aiming. I take it your position is that you have substantially more here than that alone. Thank you, your honor. That is correct. Perhaps the most critical fact that substantially more than was present in Wenat is that we don't just have, or BNG didn't just operate an interactive website, zing.com. BNG also developed and inserted into the United States stream of commerce a mobile application, both in the Google Play Store and in the Apple App Store. And what's critical about the app, and to be clear, the app contained the entire universe of songs, infringing and otherwise, on Zing MP3 that were on the website, the same as were available on the app. But what's critical with the app is whereas any user anywhere in the world can just type in the website and go to the website on their computer with a website, with an app, you have to download the app. And a user can only download the app in their jurisdiction, for example, here is critical, the United States, if the app developer intentionally chooses to stock that app in the United States storefront. So, counsel, I've gone through the exhibits to what I think was your declaration below, and looking at like exhibits 18 forward with these raw numbers in them. I'm struck by how great a percentage of the numbers are Vietnam. And isn't something, I mean, huge percentage are Vietnam related, not United States related. And isn't something, isn't that something that mattered in the Wenat case? It did better in the Wenat case. The significance between, and unfortunately in Wenat, or unfortunately for AMA in Wenat, the raw numbers was one of the principle, in fact, one of the few jurisdictional facts they had going for them. What we have here is we have similar raw numbers, we do have a lower percentage of total use in the United States as compared to overseas. But what we do have here with respect to the raw numbers, and again, we're not arguing that raw numbers alone would be sufficient for jurisdiction. The test that we have to employ here is an aggregation of context. It's not rigid and formalistic as this court said in Bochetto, but it's, you know, it's more amorphous. You look at everything. Here, the specifics of the use of the United States is different than in Wenat because of the uniqueness of the Vietnamese American community and the significance of the Vietnamese American community when it comes to music. Your Honors, as we all know, the shared history of this country with Vietnam, when that happened, when post-war music, popular music was banned in Vietnam. Popular music that is now played in Vietnam developed here. It was only here. Counsel, I'm going to be asking your friend about this too, but I was struck by the letter to the trade rep. And I would be interested in your view as to how the letter to the trade rep plays in at all to the Wenat analysis. The letter to the trade, thank you, Your Honor, thank you for bringing that up. We believe that's one of the most critical pieces of evidence here because the letter itself is basically an admission of the conduct that was absent in Wenat. In Wenat, there was no indication whatsoever that Marcin Wenat, I believe that's how you pronounce his name, had any interactions with the United States, certainly didn't plead for ePorner, which was the website in Wenat, to be taken off the notorious infringers list so that he can do business and clean up his act and be considered a good global citizen with respect to infringement. There was no discussion between Wenat and the United States regarding his conduct. Further, there was no, basically, this is not necessarily tied to the letter, but it's indicative that there was no longstanding negotiations between AMA, the plaintiff in Wenat, and Mr. Wenat about, and Marcin, ePorner guy, to about what types of terms can we pay you to lawfully stream our content. That type of negotiation happened here, and the letter makes that clear. The letter highlights that VNG, in the jurisdictional period, actually entered into contracts with U.S. studios. They say that we have, since we started off infringing, and there's no denying that we were an infringing site, and we belonged on the list of infringers, since then, we have entered into contracts with U.S. studios, they specifically referred to Universal and Sony among them, and basically they said, with respect to those studios, they've been following the letter of the law. Their contracts with Sony and Universal required them to put Sony and Universal's content in a geo-restricted fashion on their website, so that it could only be viewed by Vietnamese users. Lang Van, in its negotiations with VNG, which, again, is another fact that's not present in Wenat, longstanding negotiations between the party, in a business sense, Lang Van asked, we pointed out, it's not just about the use of our songs to Vietnamese users. In fact, for a time, the songs were licensed through this organization, RAIB, to be seen in Vietnam, but what do we do about the overseas use? And over and over again, in the correspondence between Lang Van and VNG, which is attached to the FER, the supplemental excerpts of the record that we submitted, VNG itself acknowledges overseas use of Lang Van's content. So, again, the letter itself... If I'm remembering the exhibit, but in very small numbers in that acknowledgment, right? No, well, they do not track. This is the problem. VNG intentionally did not track the quantum of overseas use. Okay, maybe we're talking about different letters. I'm looking at something that was directed to Fox Rothschild, but maybe you're talking about something else. Okay. Yeah, no, I'm talking about, these are, just for your honor's benefit, in the FER, this is correspondence that a lot of it is in Vietnamese and there are certified translations. Okay, go ahead. Sorry to interrupt. No, so that is the correspondence I'm talking about. And if you see that, VNG itself acknowledges overseas use of Lang Van's content. Overseas there, again, we're dealing at the prima facie stage. Lang Van is an American company. The benefit of the doubt of what they mean by overseas, since domestic in that context is Vietnam, the benefit of the doubt here is that we're talking about use in the United States. They were aware of it. And then basically what's critical also about the USTR letter is that it was written in 2015. VNG might point out, oh, that's outside, per chance, the relevant jurisdictional period. It refers to conduct though, since 2012, we've been negotiating with US studios. We've been improving our act. What's critical here is VNG at that time thought that they had already succeeded below in the original dismissal for lack of personal jurisdiction. VNG did not appear originally in the original appeal before the Ninth Circuit. It seems like finally with this case out of the way, they could come out of the woodwork, announce themselves to USTR and say, hey, we are, we were up to no good, but now take us off the notorious infringers list because they believed in erroneously that they were no longer subject to liability for the conduct that they just admitted to in the USTR letter. And in addition to the USTR letter and the act, the act factors, which again are the most critical, I believe distinguishing factors between this case and we're not. We have to look at what the purpose, and we pointed to seven other additional factors in our brief, but I think it also behooves this court to look at what the purpose of the purposeful direction analysis, prong is about. That's for purposes of determining due process here. And the USTR letter makes clear that VNG at this point, basically 2014, because we are talking about 2014 VNG, not present VNG, but by 2014, VNG could reasonably expect to be held into court in the United States. They were, they were negotiating directly with Apple. They were protesting when their app, when their Zing MP3 app was pulled from the app store. They were protesting when it was pulled from the Google store. They offered to fly to America to work things out. And, and it is not a situation where you just have a small, relatively low level operator putting porn on a website overseas for all to see in America. Again, because the content, the specific content outside of Vietnam, and this goes back to your honor's original inquiry, the content here has a unique American, American focus. It's at least Lang Van's content that was posted on there. That is the Vietnamese, the very strong, very, very pop culture oriented, especially when it comes to Vietnamese music, Vietnamese American user base, which is centered in Orange County, but also appears nationwide. And if you look at the percentages, your honor, Vietnam itself as a country has about 100 million people in it. About two to 3% of use on VNG's website was United States use. How many Vietnamese Americans are in the United States? Two to three million. It tracks with a significant portion, and that portion is the dominant force in basically Vietnamese entertainment. In a sense, their Hollywood is based in Orange County. And I'll reserve my time here after unless you have any other questions. All right. Thank you. Counsel, whenever you're ready. Thank you. Good afternoon, your honor. May it please the court. My name is Kelly Perigo, and I represent VNG Corporation. This case arises out of allegations that a Vietnamese corporation acting in Vietnam uploaded Vietnamese language songs to a Vietnamese server for an audience located overwhelmingly in Vietnam. Due process requires a showing. And that's why you translated your website to English? Thank you, your honor. The website actually was not translated to English. The website, the evidence in the record is the website wasn't Vietnamese. It's not a .com website. It's a .vn website. There was evidence that the app was translated into English, and evidence on that point was that it was to facilitate approval of the app. But I think the more important point there is that whether something is in English is not evidence of express aiming at the United States. There are lots of English-speaking countries and lots of folks who speak English that does not show a desire to target the U.S. And they're all in Vietnam. Counsel, what other countries besides the United States, is there any other country besides the United States that has a larger English-speaking population than the U.S.? I'm not sure about that, your honor. That would be pretty fundamental, and it just seems like such a preposterous question that I was even hesitant to ask it. Of course the United States has the largest number of English speakers. You don't really want to go and look for those statistics and provide them to the court, do you, counsel? No, your honor. And that's, again, the English language piece is not really determinative here. As I said, that's not that the app is in English. But why would the fact that most of the users were in Vietnam and were Vietnamese speakers, and let's assume that all of the Vietnamese Americans are accessing this in English rather than Vietnamese, just to make it easy, why is that fact even interesting? Why is that important to anything? That question might go to venue. It might go to something else. But, for example, in Calder, where the court talked about the effects test, nobody asked whether the newspaper was selling more copies in California where Shirley Jones lived than it was someplace else, let's say Florida. She was damaged in California because she lived in California because it was an intentional tort. But nobody asked whether more papers were sold in California than they were sold someplace else. That fact might be interesting for something else, maybe venue. But it wasn't relevant to personal jurisdiction, so why would we care whether more of their users were in Vietnam than were in the United States? Well, Your Honor, part of the reason that we look at the amount of usage in the forum is because we're trying to determine whether there was an intent by the defendant to target the forum. And so we're looking at was the forum the focal point of the defendant's website? It doesn't have to be the focal point. It just has to be important. And if you've translated your app into English, and unless you think that you've got another country that has more English speakers than the United States, then it's pretty clear that that's got to be targeted at least at the United States and perhaps other countries. Now, we don't have to worry about whether Canada would have personal jurisdiction or the U.K., but the United States with its 300 million-plus English speakers looks like a pretty big target. Well, it may be consistent with a desire to target the United States, but there's no proof in the record that the reason that the app was translated into English was for the purpose of targeting the United States. And that's a distinction that's drawn and whatnot. In that case, the court said, well, yes, you have these U.S. contracts with a DNS provider, which makes the website faster for a United States audience to access. That may be consistent with the desire to target the U.S., but we don't have evidence that that was the motivating factor. The biggest problem that I have with trying to apply whatnot here is that in whatnot, all of the downloading was being done by the users. And in this case, you've got pretty good evidence that the downloading was being done by VNG in Vietnam of songs belonging to an American company. That's a pretty big distinction. Your Honor, looking at the uploading, that just gets you to the first prong of the intentional act. But the intentional act has to be directed at the forum. And here we have lots of evidence that it was Vietnam that was the focal point, the sole focal point here of the website. But, counsel, looking at the raw numbers, like, for example, Exhibit 20 to Mr. Baskin's deposition, I mean to his declaration, it shows, maybe I'm not completely understanding it, but it shows in the United States 8 million-plus users, 5 million-plus new users, 16 million sessions. And while that's a modest percentage of the whole, in raw numbers, and that's just on one of the three sets that I looked at, those are very big numbers. That, to me, really distinguishes it from WANOT, including adding to that your client wanted to do business in the United States, and that's why it wrote the trade rep, right? No, Your Honor, and I'd like to get to the points about the trade rep letter and the negotiations with Lang Van, but just quickly on the point about the raw numbers. I mean, the relevant consideration here is really the percentage, and that's what WANOT looks at. We don't know what the raw numbers were in WANOT. Well, that's one of the things WANOT looked at. That's right, Your Honor, and WANOT looked at, actually, four of the key arguments that Lang Van raised here and disposed of all of them, and there we had 20 percent, the plurality, the largest audience was in the United States as compared to 1 to 4 percent here with the overwhelming majority at between 86 and 96 percent being in Vietnam. But I do want to address the point about the USTR letter, and I think this is one of the arguments that was raised in the reply that I think somewhat mischaracterizes the record in that the USTR letter talks about these contracts with U.S. rights holders, but the agreement with Universal is for a Vietnamese audience, and so that's just more evidence that VNG's Zing MP3 was targeted at Vietnam and not the United States. Didn't you agree to exclude Universal from any downloads in the United States? Your Honor, Universal, yes. Okay, and so that confirms, because that's the second part of it, isn't it? You made it virtually exclusive to Vietnam because you excluded the United States from anybody in the U.S. who was going to access your website could not get to Universal's music. That's right, Your Honor, but due process requires that there be affirmative acts by the defendant. There's no requirement that the defendant take an act in order to avoid jurisdiction. I take the point as a general point, but when your company has the option of excluding certain countries or certain places or certain kind of downloads on its website and it decides not to check that box, that may be. Again, I don't think that's much of an extension of law to say, well, if you get to check the box, it says, yes, send it to everybody, and didn't say the one that says, except for the United States, that that would qualify as an affirmative act. You certainly had that option, and you took the option with respect to Universal. You excluded all Universal music from U.S.-lit downloads. Your Honor, there's always the option. I mean, a website can also be geo-blocked to the United States, but this court has never held that that's a requirement. And in fact, the court has repeatedly reaffirmed that the fact that a website is universally accessible does not mean that there's personal jurisdiction everywhere, that the website can be accessed. But counsel, the ultimate question is, is it not under 4K2? Isn't the ultimate question whether the exercise of jurisdiction is reasonable and comports with the Constitution? It is, Your Honor, that it must comport with the Constitution. And Walden makes clear, though, that there are several guideposts that need to be checked here. So it needs to be an intentional act by the defendant. It has to be directed at the forum, and it has to be related to the litigation. Is it correct, counsel, that I believe the app was downloaded more than 300,000 times in the United States? Your Honor, I believe that's roughly the number in the record. And more than 70,000 times in California? Yes, Your Honor. And your client could have stopped any of that from happening had it wanted to? Your Honor, that's always the case. And with an app, the evidence in the record shows that the default setting is that it's available worldwide. So it's just like an Internet website in that way. You have to go through additional affirmative steps to remove the app from particular sites. But, I mean, it strikes me as semantics that if you have two alternatives and one is the default and the second is checking a box, that going with the default isn't an affirmative act not to check the box when it's like a binary choice. Well, the way it works is the default is worldwide. You have to actually click on a different link to go in and edit and change the default. So we really are looking at it's not quite the same, I agree, as a website, but it's much closer to that than to, say, a physical storefront where you'd have to go through all sorts of affirmative acts that would be directed at the United States, like owning property or having a lease, paying U.S. taxes. All of those acts set it really far apart from the virtual storefront. Copyright law means nothing then. I mean, really. I get a copyright in the United States, and somebody can get 8 million of my tunes played without anybody paying for it because they're in another country and they decide not to geoblock. You took my stuff, you took my property that I copyrighted, you put it on your website, you created an app in English for people in my jurisdiction, and then you let them download it 8 million times, but you had no intention at all of them doing that, and you don't make any money directly from it, but your advertisers pay for it because you got access to the American market. I'm sorry, I'm having a hard time with this. Why aren't there any minimum contacts? Well, Your Honor, I think your question sort of assumes that there is liability here for B&G and that Lang Vann even owns the rights to these works, both of which are very much in dispute, and the question for this court is just where that dispute can be heard under the Constitution. And we've not dealt with very much of those same considerations that Your Honor just noted about the relative share of the U.S. audience, the fact that there was ad revenue associated with the United States, the fact that there were U.S. contracts. All of these arguments were considered and disposed of and went on. I do want to just quickly, because I think this states the record a little bit, but there was the distinguishing point about there being longstanding negotiations here with Lang Vann. The implication is that these were negotiations with the California-based plaintiff here for making the works available in the United States, and that is not supported by the record. Lang Vann omits that it has a Vietnamese entity that is headquartered in Vietnam. There was the RIAV contract through which B&G licensed many of Lang Vann's works, and when Lang Vann terminated its relationship with RIAV, B&G negotiated with Lang Vann's Vietnamese entity for making the works available in Vietnam. That's in the record at FER 123 through 125. The court heard counsel talk about this domestic and overseas piece. That does not, in context of the letter, is very clearly not talking about the licensing territory. That's talking about the songs that Lang Vann owns or purportedly owns. But counsel, dealing with U.S. companies, even if it is in the way you say, it can't be irrelevant under a long-arm statute, which 4K2 is, right? It still factors into the analysis, doesn't it? Your Honor, as I said, I think this is actually dealing with Lang Vann's Vietnamese entity, but even if it were dealing with the U.S. entity... But like Sony and Universal are certainly U.S. entities. The trade rep is certainly a U.S. officer. And even if those contacts are dealing with what you say are other issues, isn't that still relevant to the long-arm due process calculus? Well, certainly, Your Honor, if there were a dispute with Universal arising out of that contract, then absolutely that would be a relevant contact. But what Wenat tells us is that when we have U.S. contracts with people other than the plaintiff, that does not support a showing of personal jurisdiction. And there were terms of service agreements with the very users that supposedly access plaintiff's copyrighted works. There were agreements with GoDaddy.com, which was the very entity that made the domain name accessible in the United States. And same thing with the DNS server that made it faster in the United States. And none of those contracts, all of which facilitated a U.S. market, were considered sufficient under Wenat. Do you want to conclude, Counsel? Yes, Your Honor. LangVan has not met its burden here to show that B&G expressly aimed any of its acts at the U.S., and that is a requirement before it can be hailed into court here. And the district court's dismissal should be affirmed. Thank you. Thank you. Mr. Baskin, you have some time left. Thank you, Your Honors. To begin with, just to clarify the chain of correspondence that was referenced in the F.E.R. regarding LangVan's Vietnamese entity and B&G, while those negotiations started off about, and in fact B&G wanted to make them about strictly B&G's Vietnamese operations, and even though the negotiations were with LangVan's Vietnamese entity, they concerned overseas use. And if Ms. Perrigo would like to interpret the term overseas in a disputed fashion here, at this personal jurisdiction, or at this preliminary stage, we have to make a prima facie case. At best, there's disputed evidence, and all disputes get resolved in favor of the pleading party here, which would be LangVan. And that goes across the board with respect to any piece of disputed evidence, however you want to interpret the evidence in a different way than we've interpreted it. If there's conflict, it's resolved at this stage in LangVan's favor. And as Your Honors pointed out, the volitional conduct here, and the key volitional conduct that's different between this case and Wenat is, Wenat did not create a website that he actively selected to inject specifically to American audience when you could immunize yourself from jurisdiction by just not creating an app and not selecting the United States Storefront. There was clearly an intention there, by doing so, to appeal to and reach a United States audience. It was not the focal point of B&G's business, but as Your Honors pointed out, it was a focal point. And the USTR letter merely reasserts and reinforces that. Thank you, Your Honors. All right. We thank counsel for their arguments, and the case just argued is submitted. With that, we are concluded for today. This court, for this session, stands adjourned.
judges: BYBEE, BENNETT, Bataillon